IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                                          Criminal Action No. 3:19-cr-122

JELANI A. JONES,
        Defendant.

## **OPINION**

      Jelani A. Jones has moved to suppress incriminating statements he made to police officers after receiving warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Jones contends that the officers engaged in an impermissible "two-step" questioning tactic to secure his confession. Specifically, Jones argues that the officers waited to advise him of his *Miranda* rights until he admitted to criminal conduct, only to later give the proper warnings and then elicit the same incriminating statements. Because the officers did not intentionally undermine *Miranda* by giving the midstream warnings, the Court will deny Jones' motion to suppress.

## **I. BACKGROUND**

      On May 18, 2019, Virginia State Trooper Charlie McKenna and Richmond Police Department Detective Carrie Griffith pulled over an SUV for a faulty brake light.[1] Jones' brother was driving the SUV; Jones was riding in the passenger's seat. Trooper McKenna approached Jones' brother at the driver's side, and Detective Griffith approached Jones at the passenger's side. Trooper McKenna and Detective Griffith asked the brothers for identification and returned to the patrol car to check for outstanding warrants.

---

[1] The government submitted the video footage from the officers' body cameras. The Court draws the following facts from the relevant portions of the body camera footage and the testimony from the suppression hearing held on November 20, 2019.

Meanwhile—about six minutes into the stop—Virginia State Trooper Austin Albright arrived on the scene. Albright ran a "sweep" of the SUV with his drug dog. The dog "alerted" to the rear bumper of the SUV. Following the dog's "alert," Trooper McKenna asked Jones and his brother if they had any drugs.[2] Jones admitted that he had a small amount of marijuana. Detective Griffith and Trooper McKenna then told both men to step out of the SUV and handcuffed them. While handcuffing Jones—about nine minutes into the stop—Detective Griffith told Jones that she was "detaining" him but that he was not under arrest.[3]

About two minutes after Detective Griffith handcuffed Jones, Trooper McKenna spotted a black Glock box under the passenger's seat of the SUV. Trooper McKenna asked Jones if the Glock box belonged to him. Jones responded, "Yeah, that's mine." Jones then turned to a fourth officer on the scene—Richmond Police Department Officer Severin Odic—and asked if he could light his cigarette "before [he] go[es]." When Officer Odic asked Jones where he was going, Jones responded that he was going to jail. Officer Odic then asked Jones why he was going to jail. Jones replied, "I got the pistol under the seat." Neither Trooper McKenna nor Officer Odic advised Jones of his *Miranda* rights before questioning him.

After Jones admitted to owning the Glock box, Detective Griffith and Trooper McKenna began a more thorough search of the SUV. Detective Griffith opened the Glock box and found a gun with an obliterated serial number. The officers also uncovered a second gun in the center

---

[2] Trooper McKenna recognized Jones from an earlier unrelated encounter. Neither Trooper McKenna nor Detective Griffith knew that Jones was a convicted felon.

[3] At the suppression hearing, the Court asked Detective Griffith to explain the difference between "detaining" a suspect and arresting that person. Detective Griffith acknowledged that a "detention" and an arrest involve the same degree of restraint on a person's freedom of movement. She also conceded that Jones was not free to leave once she had "detained" him. Detective Griffith, however, said that she likely would have released Jones—notwithstanding the possession of marijuana—if she and Trooper McKenna had not later found illegal weapons in the SUV.

console of the SUV. When the officers found the second gun—approximately fourteen minutes into the stop—Trooper McKenna asked Jones and his brother who owned the gun. Trooper McKenna did not give *Miranda* warnings before asking about the gun. Jones told Trooper McKenna that he owned both guns and that he had scraped the serial number off the first gun.

Once the officers finished searching the SUV—about ten minutes after Jones said that he owned both guns—Trooper McKenna read Jones his *Miranda* rights. Jones asked if he could stop talking at any time, and Trooper McKenna confirmed that he could. Trooper McKenna and Detective Griffith then asked Jones where he bought the guns, how much he paid for them, when he bought them, and why he had the guns with him. In response, Jones again said that he owned both guns and that he paid $350 for the guns. Finally, Trooper McKenna asked Jones why he put his brother in a perilous situation by keeping illegal weapons in the SUV. Jones insisted that his brother did not know about the guns and then declined to answer further questions.

On September 3, 2019, a federal grand jury indicted Jones for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Jones has moved to suppress his post-*Miranda* statements to Trooper McKenna and Detective Griffith.[4] Jones contends that the officers deliberately withheld *Miranda* warnings to secure his confession, and then gave proper warnings before eliciting the same incriminating statements. The government argues that the officers did not intentionally withhold *Miranda* warnings, and that Jones voluntarily made the inculpatory statements after Trooper McKenna properly advised Jones of his rights.

---

[4] Jones initially moved to suppress his pre- and post-*Miranda* statements. At the suppression hearing, the government indicated that it would not seek to introduce the pre-*Miranda* statements. Because the parties only contest the admissibility of Jones' post-*Miranda* statements, Jones' motion is moot to the extent that he asks the Court to suppress his unwarned statements.

## II. DISCUSSION

### A. *Legal Standard*

In *Miranda*, the Supreme Court established the familiar rule that the police must advise suspects in a custodial interrogation of their constitutional rights to silence and counsel. 384 U.S. at 444-45. If officers fail to give proper *Miranda* warnings before securing a defendant's confession, the government generally may not introduce that confession at trial. *Id.* "Conversely, giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (plurality opinion). After *Miranda*, the police developed various questioning tactics that tested the bounds of the Court's holding.

One such tactic, the "two-step police protocol," involves "intentionally withholding *Miranda* warnings from a suspect, questioning the suspect until securing a confession; then obtaining a waiver of *Miranda* rights from the suspect and covering the same material using leading questions." *United States v. Mashburn*, 406 F.3d 303, 307 (4th Cir. 2005). The Supreme Court eventually weighed in on the two-step tactic, rendering the splintered decision that lies at the heart of this motion. *See Seibert*, 542 U.S. at 604.

In *Seibert*, five Justices concluded that the "midstream recitation of warnings . . . could not effectively comply with *Miranda*'s constitutional requirement." *Id.* at 604. Only four Justices, however, could agree on the test courts should use to determine when midstream *Miranda* warnings pass muster. The plurality set forth the following factors for courts to consider:

> the completeness and detail of the questions and answers in the first round of questioning, the two statements' overlapping content, the timing and setting of the first and second rounds, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615.

Justice Kennedy agreed that the defendant's statements were inadmissible, but rejected the plurality's multi-factor test. *Id.* at 622 (Kennedy, J., concurring in the judgment). For Justice Kennedy, the plurality's approach "cuts too broadly," because it "envisions an objective inquiry for the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations." *Id.* Thus, in Justice Kennedy's view, courts should apply a "narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.*

The lack of a controlling opinion in *Seibert* forced lower courts to determine what test to apply when confronting midstream *Miranda* warnings. In *Mashburn*, the Fourth Circuit adopted Justice Kennedy's opinion as *Seibert*'s holding, reasoning that "Justice Kennedy concurred in the judgment of the Court on the narrowest grounds." 406 F.3d at 308.[5] Accordingly, absent evidence of "the deliberate 'question-first' strategy," *id.* at 309, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made," *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). The Court, therefore, must determine whether the officers' "failure to convey *Miranda* warnings to [Jones] was deliberate or intentional." *Mashburn*, 406 F.3d at 309.[6]

---

[5] "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted).

[6] At the suppression hearing, Jones' counsel argued that Justice Kennedy's opinion cannot represent *Seibert*'s holding because it focuses on the subjective intent of the officers. *See United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1139 (9th Cir. 2005) (Berzon, J., dissenting in part) ("[T]hree of the four Justices in the plurality *and* the four dissenters decisively rejected any subjective good faith consideration, based on deliberateness on the part of the police."); *see also United States v. Ray*, 803 F.3d 244, 272-73 (6th Cir. 2015) (adopting the plurality's multi-factor test). The Fourth Circuit, however, has explicitly adopted Justice Kennedy's test as *Seibert*'s holding. *See Mashburn*, 406 F.3d at 308. Thus, for *Seibert* to apply to Jones' case, the officers must have intentionally delayed giving *Miranda* warnings.

### B. Application to Jones' Case

In this case, the record provides no evidence that the officers intentionally delayed *Miranda* warnings to produce Jones' confession. Jones asserts that his unwarned and warned statements all took place within the span of approximately fifteen minutes during a single traffic stop. Jones further notes that the questions involved the same police officers and overlapping content regarding his ownership of the guns.[7] But *Seibert* applies only when police officers "intentionally delayed delivering *Miranda* warnings to provoke [a defendant's] admissions." *United States v. Dorsey*, 744 F. App'x 130, 134 (4th Cir. 2018). Indeed, "[w]ithout a showing of the officer's subterfuge, the mere fact that [a defendant] made pre-*Miranda* statements and post-*Miranda* statements does not render his post-*Miranda* statements involuntary and inadmissible." *Id.*

The record does not support a finding that the officers intentionally or deliberately undermined *Miranda*. Rather, the evidence indicates that the officers confronted a fluid situation, which evolved within minutes from a routine traffic stop to an investigation into illegal weapons, and that Trooper McKenna elicited Jones' unwarned statements to identify which brother owned the weapons. *Cf. United States v. Davis*, 645 F. Supp. 2d 541, 554 (W.D.N.C. 2009) (finding no evidence that the police deliberately delayed giving *Miranda* warnings during a traffic stop). The Court, therefore, must consider whether Jones "knowingly and voluntarily" made his warned admissions. *Elstad*, 470 U.S. at 309.

Jones does not—and cannot—argue that he involuntarily made the post-*Miranda* statements to Trooper McKenna and Detective Griffith. Indeed, Jones asked if he could stop answering questions at any time, and eventually chose to do so once the officers began asking if

---

[7] Trooper McKenna, however, did not mention any of Jones' unwarned statements during the post-*Miranda* questioning. Additionally, the post-*Miranda* questioning took place after a ten-minute break in time from Jones' last unwarned admissions.

his brother knew about the guns. *See United States v. Khweis*, No. 1:16-cr-143, 2017 WL 2385355, at *13-14 (E.D. Va. June 1, 2017) (finding that the defendant voluntarily waived his rights after receiving midstream *Miranda* warnings). Thus, the evidence demonstrates that Jones "made a rational and intelligent choice . . . to waive . . . his rights." *Elstad*, 470 U.S. at 314.

In sum, the record provides no evidence that the officers deliberately undermined *Miranda*. Accordingly, the "subsequent administration of *Miranda* warnings should suffice to remove the conditions that precluded admission of the earlier statement." *Id.*

### III. CONCLUSION

Because there is no evidence that the officers intentionally delayed giving *Miranda* warnings, the Court will deny Jones' motion to suppress.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 17 January 2020
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

7